UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Jay Connor, <br><br> Plaintiff, <br><br> Vs. <br><br> Vantis Life Insurance Company and <br><br> Tech Leads, LLC <br><br> Defendants. | C/A No: 2:20-cv-01366-DCN-MGB <br><br> **AMENDED VERIFIED COMPLAINT** |

Plaintiff complaining of the Defendants alleges as follows:

## TYPE OF ACTION

1. This is an action to recover statutory damages imposed by 47 U.S.C. § 227, and trebled damages constituting forfeiture or other penalty and S.C. Code Section 37-21.

## PARTIES

2. Plaintiff is a resident of Charleston County, South Carolina.

3. The calls alleged in this complaint were made to Plaintiff's wireless phone line in South Carolina.

4. Defendant VANTIS LIFE INSURANCE COMPANY. (hereinafter "Vantis") is an insurance company licensed to sell policies in South Carolina.

5. Vantis' offices are located at 200 Day Hill Road, Windsor CT, 06095.

6. Vantis conducts and transacts business in South Carolina.

7. Vantis either directly or by those on its behalf, makes calls to residents of South Carolina.

8. Defendant TECH LEADS, LLC (hereinafter "Tech Leads") is a lead provider for insurance companies.

1

9.  Tech Leads conducts and transacts business in South Carolina.

10. Tech Leads either directly or by those on its behalf, makes calls to residents of South Carolina.

11. The location of Tech Leads' offices is unknown at this time.

## VENUE AND JURISDICTION

12. This cause of action arises out of conduct of Defendants initiating telephone calls to Plaintiff's wireless telephone number in Charleston County South Carolina.

13. Plaintiff is a resident of Charleston County.

14. Vantis removed the original case from Charleston County Magistrates Court pursuant to *Mims v. Arrow Fin. Services. LLC 565* U.S. 368, 372 (2012). This court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute.

## The Telephone Consumer Protection Act

15. Enacted in 1991, the TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1). Calls made by an automated telephone dialing system ("ATDS") or with a prerecorded or artificial voice are referred to as "robocalls" by the FCC. Encouraging individuals to hold robocallers accountable, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(b)(3).

16. In enacting the TCPA, Congress found: "Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 § 2(10). Congress continued: "Banning such automated or prerecorded telephone

calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id.* § 2(12).

17. The TCPA's sponsor described unwanted robocalls as "the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone out of the wall." 137 Cong. Rec. 30,821 (1991) (statement of Sen. Hollings).

18. The Federal Communications Commission ("FCC") has made clear that "prior express written consent" is required before making telemarketing robocalls to wireless numbers. Specifically, it ordered:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnotes omitted) (internal quotation marks omitted).

19. Under the TCPA, an individual may be personally liable for the acts alleged in this Complaint pursuant to 47 U.S.C. § 217 of the TCPA, which reads, *inter alia*:

> [T]he act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user *as well as of that person*. 47. U.S.C. § 217.

20. When considering individual officer liability, other Courts have agreed that a corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *See, e.g.*, *Jackson Five Star Catering, Inc. v. Beason*, 2013 U.S. Dist. LEXIS 159985, *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA "where they 'had direct, personal participation in or personally authorized the conduct found to have violated the statute.'"); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

21. This is consistent with the general tort principle that corporate officers or agents are personally liable for those torts which they personally commit, or which they inspire or participate in, even though performed in the name of an artificial body.

## **The Worsening Problem of Robocalls**

22. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting Off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC chairman).

23. "The FTC receives more complaints about unwanted calls than all other complaints combined." Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016), https://www.ftc.gov/system/files/documents/advocacy_documents/commentstaff-ftc-

bureau-consumer-protection-federal-communications-commission-rulesregulations/160616robocallscomment.pdf

24. In fiscal year 2017, the FTC received 4,501,967 complaints about robocalls, compared with 3,401,614 in 2016. Federal Trade Commission, *FTC Releases FY 2017 National Do Not Call Registry Data Book and DNC Mini Site* (Dec. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-nationaldo-not-call-registry-data-book-dnc.

25. *The New York Times* recently reported on the skyrocketing number of robocall complaints and widespread outrage about illegal telemarketing. Tara Siegel Bernard, *Yes, It's Bad. Robocalls, and Their Scams, Are Surging*, N.Y. Times (May 6, 2018), https://www.nytimes.com/2018/05/06/your-money/robocalls-riseillegal.html; *see also* Katherine Bindley, *Why Are There So Many Robocalls? Here's What You Can Do About Them*, Wall St. J. (July 4, 2018), https://www.wsj.com/articles/why-there-are-so-manyrobocalls-heres-what-you-can-do-about-them-1530610203.

26. Even more recently, a technology provider combating robocalls warned that nearly half of all calls to cell phones next year will be fraudulent. Press Release, First Orion, Nearly 50% of U.S. Mobile Traffic Will Be Scam Calls by 2019 (Sept. 12, 2018), https://www.prnewswire.com/news-releases/nearly-50-of-us-mobile-traffic-will-be-scam-calls-by-2019-300711028.html.

**TELEPHONE CALLS MADE TO PLAINTIFF**

27. On or about January 24, 2020, a telephone call was initiated to the Plaintiff's wireless telephone line XXX-XXX-2155.

28. The caller ID transmitted in the call was 704-763-9935.

29. When the Plaintiff answered the call, there was a long pause and a loud click, indicating the use of an automatic telephone dialing system.

30. The caller identified herself as "Chris" from "Senior Care".

5

31. Upon information and belief, "Senior Care" is a non-existent entity and "Senior Care" is used as an alias name to conceal the identity the source of the unsolicited, anonymous calls used to sell life insurance for defendants.

32. After several attempts, "Chris" transferred Plaintiff to Roberta Talbot, who sent Plaintiff a quote for a Vantis Insurance policy.

33. The name "Vantis" was not revealed until the call was transferred to Ms. Talbot.

34. In the call described herein, Defendants willfully and/or knowingly intended to deliver a solicitation to the called party.

35. Connor answered the unsolicited, anonymous, unwanted call alleged herein, and responded affirmatively to questions about insurance to identify the source of the call.

36. Prior to the call, Plaintiff had never given express written consent for Defendants to contact him by an automatic telephone dialing system or prerecorded message.

37. On or about January 27th, 2020, Plaintiff left a voicemail for Ricardo Nunez, the General Counsel for Penn Mutual the parent company for Vantis, about the unsolicited call on January 24, 2020. Penn Mutual did not return the call.

38. Although Vantis has asserted that Plaintiff filled out an online application for the 1/24/20 call, Vantis has not provided this information to Plaintiff.

39. Upon information and belief, prior to 1/24/20, Plaintiff received at least three (3) other unsolicited calls by or on behalf of the defendants regarding life insurance.

### **VANTIS VICARIOUS LIABILITY**

40. Vantis is a "person," as defined by 47 U.S.C. § 153(39).

41. The FCC is tasked with promulgating rules and orders related to enforcement of the TCPA. 47 U.S.C. 227(b)(2).

42. The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

43. The FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

44. The FCC confirmed this principle in a declaratory ruling holding that sellers such as Vantis may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because sellers may have thousands of independent marketers, suing one or a few of them is unlikely to make a

7

> substantive difference for consumer privacy. *In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted) (alteration marks and internal quotation marks omitted).

45. More specifically, *Dish* held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 34.

46. The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

47. To the contrary, the FCC—armed with extensive data about robocallers and Americans' complaints about them—determined that vicarious liability is essential to serve the TCPA's remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587 ¶ 36.

48. Vicarious liability is important because reputable, traceable, and solvent companies that benefit from illegal telemarketing are "in the best position to monitor and police TCPA compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

49. Vantis is legally responsible for ensuring that the company who made the telemarketing calls for them complied with the TCPA, even if Vantis did not themselves place the calls.

50. Vantis knowingly and actively accepted business that originated through illegal telemarketing.

51. By hiring a company to make calls on its behalf, Vantis "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

52. Moreover, Vantis maintained interim control over the actions of the party that made the call.

53. For example, Vantis had absolute control over whether, and under what circumstances, they would accept a customer.

54. Vantis also gave interim instructions to the company that made the calls by providing the parameters of customers, volume of calling and contracts it would purchase.

55. Finally, the FCC held that called parties may obtain "evidence of these kinds of relationships through discovery, if they are not independently privy to such information." *Dish*, 28 FCC Rcd. at 6592-93 ¶ 46. Moreover, evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

## CAUSE OF ACTION
### Count One:
### Violations of the TCPA's Automated Calling provisions

56. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

57. The foregoing acts and omissions of Defendants and/or its affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple violations of the TCPA, 47 U.S.C. § 227, by making calls, except for emergency purposes, to the cellular telephone number of Plaintiff using an ATDS.

58. As a result of Defendants' and/or its affiliates, agents, and/or other persons or entities acting on Defendants' behalf's violations of the TCPA, 47 U.S.C. § 227, Plaintiff is

9

presumptively entitled to an award of $500 in damages for each and every violation to his cellular telephone number using an ATDS pursuant to 47 U.S.C. § 227(b)(3)(B).

59. Plaintiff is also entitled to and does seek injunctive relief prohibiting Defendants and/or its affiliates, agents, and/or other persons or entities acting on Defendants' behalf from making calls, except for emergency purposes, to any cellular telephone numbers using an ATDS and/or artificial or prerecorded voice in the future.

60. The Defendants' violations were negligent and/or knowing.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief, temporarily and permanently:

- For the statutory damages of $500 to $1,500 per violation to be awarded to the Plaintiff for each of the Defendants' violations of the TCPA;
- For an Order enjoining the Defendants from using ATDS calls, other than for emergency purposes;
- For unspecified punitive damages in an amount to be determined by this Court.
- For such other and further relief as the Court may deem just and proper.

*/s/ Jay C. Connor*

Jay Connor Plaintiff, *Pro Se*
215 East Bay Street 201-F
Charleston, SC 29401
(843) 557-5724

May 26, 2020

## VERIFICATION

The Undersigned states and swears that all the forgoing allegations are true and correct to the best of his knowledge and belief.

_____
Jay Connor

Subscribed and sworn to before me by Jay Connor on this the 26 day of May 2020.

_____
Notary Public for South Carolina
My commission expires on 2/10/2027

CHRISTINA A. JOHNSON
Notary Public - State of South Carolina
My Commission Expires February 10, 2027

11